[No. 4741.  Decided September 21, 1904.]

S. Normile, *Appellant,* v. The Northern Pacific Railway Company, *Respondent.*[1]

Carriers — Freight — Delivery — Flag Stations Without Any Agent — Shipment on Open Car — Loss of Goods.  A railroad company is liable to the consignee for failure to safely deliver goods lost after the arrival of the car at its destination, where it appears that a donkey engine with tools and cables were shipped on a flat car to F, a flag station on defendant's line, where the defendant had a warehouse but no agent, that a postal card notice was mailed to the consignee at F upon arrival of the freight, and the consignee immediately prepared to unload the car, but was unable to do so until the next day, when it was found that the tools and cables, weighing about 1,500 pounds, were missing; since the consignee was not afforded a reasonable opportunity to remove the goods prior to their loss, and the company was bound, both as carrier and warehouseman, to properly care for the goods upon their arrival.

Same — Laches of Consignee.  In such a case the consignee cannot be held guilty of laches in not unloading the car on the 17th day of December when he learned at four o'clock the day before that such a car had arrived at F and his bookkeeper spent the morning of the 17th in ascertaining about the car and in securing a suitable dray, which was not obtained in time to unload that day, and the car was unloaded on the next day.

Carriers — Delivery — Reasonable Time — Question of Law.  Where there is no dispute as to the material facts, the question as to the reasonable time for the removal of goods shipped is one of law for the court.

Appeal from a judgment of the superior court for King county, Morris, J., entered January 19, 1903, upon findings in favor of the defendant, after a trial on the merits before the court without a jury, in an action to recover from a carrier for the loss of goods.   Reversed.

*John W. Whitham,* for appellant.

[1] Reported in 77 Pac. 1087.

*James F. McElroy* and *B. S. Grosscup* (*A. A. Booth,* of counsel), for respondent.

PER CURIAM.—Action brought in the superior court of King county by plaintiff, S. Normile, against defendant, The Northern Pacific Railway Company, on account of the loss of freight. The cause was tried to the court without a jury. The following findings of fact and conclusions of law were made in the trial court:

"(1) That on December 11th, 1901, at Portland, Oregon, the defendant received from the plaintiff for shipment to Fremont, Washington, for the sum of $34, the following goods, wares and merchandise, to wit, one donkey engine and tool box and two coils of steel cable. (2) That the allegations set forth in paragraph three of plaintiff's complaint are untrue, and that the defendant did safely carry and deliver to the said plaintiff, at Fremont, Washington, in accordance with its contract of carriage, the goods, wares and merchandise herein above described, and that plaintiff has suffered no damage whatsoever. (3) That the allegations set forth in the fourth paragraph of plaintiff's complaint are each and all untrue and that plaintiff has suffered no damage in the sum of one hundred dollars or in any other sum; that there was no failure on the part of the defendant to deliver said property to plaintiff. Wherefore, the court finds as conclusions of law: that plaintiff take nothing by his said action; that the defendant is entitled to judgment for its costs and disbursements herein."

Plaintiff duly excepted to each of these findings and conclusions, save as to the first finding of fact above noted. These exceptions were overruled in the lower court, plaintiff excepted, and judgment was entered dismissing the action; from which judgment plaintiff prosecutes this appeal.

Paragraph three of the complaint, which is referred to in the findings, is in the following words and figures:

"That the defendant did not safely carry and deliver the said goods pursuant to said agreement, nor any part thereof, except the said engine, but, on the contrary, the said defendant so negligently conducted and so misbehaved in regard to the same, in its calling as carrier, that the said plow steel cable and the said tool box, together with the tools contained therein, were wholly lost to plaintiff, to his damage in the sum of $243, the same being the value of said property which the said defendant has failed to deliver to plaintiff."

The respondent company denied the material allegations of the complaint, and pleaded, as a separate defense:

"That at the time said goods were received by defendant for shipment, to wit, December 11, 1901, at Portland, Oregon, it was agreed and understood that said defendant should not be responsible for the loss of any article shipped upon open cars; that said goods were shipped upon open cars and at plaintiff's risk."

Appellant, Normile, by his reply denied all the allegations of this affirmative defense.    It was stipulated at the trial that the value of the goods lost was $243, as alleged in the complaint.

Fremont was, at the time of the alleged grievances, what was termed a flag or prepaid station, located on respondent's line of railroad in King county.    The respondent company had no regular agent at such station.    The nearest agent of the company at that time was located at Interbay, and had charge of other stations near by, including Fremont, in the matter of the delivery of freight from the cars of respondent company to consignees.    Mr. Normile, the appellant, testified, that this railway company had a warehouse or some kind of a building at Fremont; that he received the donkey engine, which was shipped with the tools and cables, from the flat car in proper condition; that these tools and cables were designed for use in connection with such engine; that he knew about the shipment

of this property from Portland on December 11, 1901; that witness expected it would arrive at its place of destination in three or four days thereafter, and that he purchased such property for use in connection with his business, which was that of a contractor; that, in going through Fremont on the street car, about four o'clock in the afternoon of December 16, 1901, he noticed a donkey engine on one of respondent's flat cars, which he supposed was his property; that the next morning he found his bookkeeper, to whom he gave directions to go and ascertain if his said property had arrived; that, when appellant had procured a dray on the morning of the December 18th, for the purpose of removing this property, the tools and cable were missing; that he did not get his mail at Fremont, and received no notice of the arrival of this freight through the mail; that he did not know that Fremont was a flag or prepaid station; that the weight of this merchandise in question was about fifteen hundred pounds, and was in two parcels. Mr. Maitland R. Sanford, appellant's bookkeeper, testified in part as follows:

"Well, it was on the morning of the 17th, possibly half-past nine, that I met Mr. Normile, and he informed me that, in passing through Fremont the night before, he had seen a donkey engine on a flat car there. Well, he was expecting an engine for his work on the canal, and he instructed me to look the matter up and ascertain if that was his, and, if so, to order a dray and remove it. Now, I tried to find the agent, done some telephoning  .  .  . in order to ascertain if that was Mr. Normile's engine before ordering the dray, but I failed to do so.  .  .  . It was nearly noon then, perhaps 11:30; I found a drayman that had a dray of sufficient size to remove the engine, but it was too late for him to get then to Fremont and remove the engine—too late in the day. Well, of course if it was too late for him, it was too late for any other drayman to get there. So that was all I could do, I could not get the

drayman to take it off on that day. So this drayman came the following morning and it was too late then, the stuff was taken off then, that is, the tool chest and contents and cable. . . ."

Witness, continuing his testimony, said that, after he was notified by appellant of the arrival of the freight, it took an hour and a half to find the agent of respondent before ordering the dray; that he did not find any agent at Fremont station; that there was none there permanently. A. S. Pattullo, the secretary of the Columbia Digger Co., the consignor of this shipment, testified by deposition, that, "the Columbia Digger Co. had nothing to do with the way it was to be shipped, and there was no arrangement in regard to any reduction of freight."

On the part of the defense, the affidavit of Mr. Jas. F. McElroy, by stipulation, was read in evidence. This affidavit related to the testimony of witness Tillotson, who was in the employ of appellant at the time of the arrival of this freight, and was to the effect that the engine and other property, which Mr. Normile stated were there for delivery, were at Fremont on the morning of December 17, 1901, in the same condition as when loaded on the flat car at Portland, where Tillotson helped load this freight; that the dray Mr. Normile had engaged to convey such property from the car, to be used on the Lake Washington canal, did not arrive till December 18, 1901; that witness then went with four assistants to unload such freight from the car on to the dray, and found that the tools and cable had been removed. W. S. Clark, a witness for respondent, testified, in part, that in December, 1901, he was respondent company's agent at Interbay, that he had in his possession the data with reference to the shipment of the above property to appellant; that it arrived at Fremont on December 14, 1901; that the bill of this shipment was re-

ceived by witness about nine o'clock in the morning of that day; that he sent notice of the arrival of this freight to appellant by postal card, which he deposited in the post-office at Ballard on the afternoon of December 14th, directed to Mr. Normile, at Fremont; that the first time witness learned about the loss of this freight was about December 26, 1901, when he received a letter through the mails from appellant's attorney, Mr. Whitham.

The respondent contends that appellant, by preparing to remove these goods on the 17th day of December, 1901, accepted the delivery thereof on the side track at Fremont. For the purposes of this controversy, we think that it is immaterial whether this freight arrived at Fremont on the 14th or 16th of December, 1901, though, from the testimony adduced in appellant's behalf, and the statements contained in Mr. McElroy's affidavit, it would seem that the latter date is the correct one.    There is no question but that these goods arrived at Fremont in the same condition as when the same were loaded on the car at Portland, and they were at such station on December 17, 1901. We must bear in mind that the days, at that season in the year, are of short duration.

"Where goods are shipped to a place where there is a side-track, but no depot, platform or agent of the carrier, and this is known to the parties, and is not unreasonable in view of the small amount of business, it has been held that leaving the car of goods upon the sidetrack is a good delivery and relieves the company from further responsibility."    Elliott, Railroads, § 1521.

The rule was announced in the case of *Kirk v. Chicago etc. R. Co.,* 59 Minn. 161, 60 N. W. 1084, 50 Am. St. 397, that, while it is usual for the consignees themselves to unload and carry away certain kinds of freight, such as coal, lumber, and the like, directly from the cars:

"It is also true, . . . that there is nothing to prevent a carrier, at least under special circumstances, from using the car as its warehouse for the storage of freight. But in the case of portable boxes or packages of valuable merchandise we think that, under any ordinary circumstances, . . . in order to terminate the carrier's liability he must remove the goods from the car in which they were transported and place them for safe keeping in his freight house."

It is impossible to formulate any general rule, applicable to all cases, as to what constitutes a good and sufficient delivery of freight by the carrier to consignees. Each case must necessarily, to a great extent, depend upon its own particular circumstances. The question of delivery to a consignee is usually a question of fact, or a mixed question of law and fact, for the jury, under proper instructions from the court. Sometimes, where the facts are undisputed, a question of law only is presented for the decision of the court. Elliott, Railroads, § 1517, and authorities cited.

"It may be stated, generally, that every delivery must be made to the right person, at a reasonable time, at the proper place, and in a proper manner. These are all requisites of a valid delivery, except· in so far as a compliance with them may be waived by the party entitled to the goods." Hutchinson, Carriers (2d ed.), § 340.

Unquestionably, as a general rule, the manner of delivery may be regulated by contract, but, in the absence of any specific stipulation upon the subject, it is, in a great measure, determined by custom. The carrier must, however, afford the consignee an opportunity to unload and remove his goods. On the other hand, the consignee must exercise reasonable diligence in the matter of the receiving and removal of his freight. The appellant prepaid the regular freight charges on this shipment, and was entitled to the

protection that the law afforded him in that behalf. The following propositions of law, pertinent to this controversy, are enunciated by a learned author:

"The carrier's responsibility does not end by mere delivery on the platform or dock at the place of destination; there must be such actual delivery as fills the contract of carriers; or, if not applied for by the consignee, the goods must be safely warehoused; then the liability as carrier ceases, and that of warehouseman begins. . . . And so jealous is the law in guarding the rights of shippers against contracts of carriers exempting themselves from the consequences of their own negligence, and so obligatory is the duty of carriers to furnish suitable vehicles and appliances for the transportation of property received to be carried, that the knowledge of shippers of the character of cars furnished will not exempt the company from liability for loss occasioned by the insufficiency thereof, although the contract of shipment be that there shall be no such responsibility on the part of the company." 2 Rorer, Railroads, pp. 1292, 1293.

While it is true that these goods, which were lost or stolen, were intended for use in connection with the donkey engine, and that it was more convenient for the respondent to load the whole shipment on one flat car, as such engine could not well have been placed in a box car for shipment, and that it was intended by both carrier and consignee to be unloaded and received direct from the flat car at the place of destination, still it does not appear by any testimony in the record but that this respondent company might have placed these particular goods (the tools and cable) in its warehouse or building at Fremont station; that otherwise respondent is liable to appellant for their value. It would seem, from the showing made in the record, that appellant was not afforded a reasonable opportunity to enable him to remove these particular goods from the car prior to their loss, and that such loss should be borne by the respondent.

The principal authority, cited by respondent's counsel in support of their contentions, is *Allam v. Penn. R. Co.*, 183 Pa. St. 174, 38 Atl. 709, 39 L. R. A. 535.    The points decided are fairly presented by the syllabus:

"As a general rule a common carrier must give to the consignee of goods, notice of their arrival at the point of destination. While a common carrier cannot stipulate for a release from the consequence of his own negligence or fraud, yet he can modify his liability as such so far as to provide that notice of the arrival of goods need not be given at small stations where no station house has been built and no freight agent located. A contract that at such stations the goods shall be at the 'risk' of the owner until loaded into cars, and when unloaded therefrom is not against public policy and will be enforced. Where goods are carried under such a contract all responsibility for protecting the same after the goods reach their destination is assumed by the consignor."

It would seem that, in the matter of such shipments, the consignor acts as the agent of, or represents, the consignee. In this Pennsylvania case, the bill of lading under which the goods were received by the carrier contained the following provision:

"When merchandise is destined to or from way stations and platforms where station buildings have not been established by the carrier, or where there are no regularly appointed freight agents, it shall be at the risk of the owner until loaded into the cars and when unloaded therefrom; and when received from or delivered on private turnouts it shall be at the owner's risks until cars are attached to and after they are detached from the train."

We find no such stipulation in the bill of lading which was received in evidence in the action at bar.    Furthermore, it appeared in the authority last cited, that at Strafford, the place where the goods were to be received, there was no shelter and no regular agent of the carrier company to take charge of the freight upon its arrival. "The only

convenience at Strafford for the receipt and delivery of goods was a platform by the side of the road." Thus, it is plain to be seen that the facts in the *Allam* case are noticeably dissimilar from those in the present controversy; that, while it may have been inconvenient for the respondent to have unloaded the goods in question, and stored them in its station house or building at Fremont, still, in the absence of any express stipulation, it was bound to properly care for these goods upon their arrival, both in the capacity of a carrier and warehouseman, under the well established rules of the common law.   See Rorer, Railroads, pp. 1292, 1293.

Regarding the matter of notice to Normile, the consignee, we think that, under the facts as disclosed by the record, no notice was required; but, assuming that such notice was necessary, the agent, unless otherwise advised, had the right to assume that notice addressed to the consignee, at the point of destination, would reach him in the due course of the mail.    Appellant, on the arrival of these goods at Fremont station, pursued the safer method of first communicating with the agent, on the 17th day of December 1901, before removing the same from the car. It would therefore seem unreasonable to charge the appellant with laches in not being prepared to receive and remove this freight until the morning following the date last named.    There is no showing made in the record other than that the appellant acted with reasonable diligence in this particular.    Where there is no dispute about the material facts, this question of reasonable time in which goods are to be removed by the consignee is one of law for the court.  *Hedges v. Hudson River R. Co.,* 49 N. Y. 223.

The judgment of the lower court is reversed, and the cause remanded, with instructions to enter a judgment for the agreed value of the goods lost.